```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
                  INDIANAPOLIS DIVISION
```

| | |
|---|---|
| CARMEN R. PERRY SHARP, )<br>         Plaintiff,         )<br>                                  )<br>    vs.                         )<br>                                  )<br>MICHAEL J. ASTRUE, Commissioner of  )<br>the Social Security Administration,  )<br>         Defendant.              ) | 1:10-cv-01488-LJM-TAB |

### **ENTRY ON JUDICIAL REVIEW**

Plaintiff, Carmen R. Perry-Sharp ("Perry-Sharp"), requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), which concluded that Perry-Sharp was entitled to a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") beginning on January 1, 2006 and ending on November 2, 2008, when medical improvement occurred. Perry-Sharp asserts that her disability did not end on November 2, 2008 and, in fact, continued through the date of the decision, December 16, 2009.

### I. **BACKGROUND**

### A.  **PROCEDURAL HISTORY**

On February 9, 2007, Perry-Sharp filed applications for DIB and SSI. R. at 117-22. Initially, her applications were denied. R. at 59-62; 63-66. Her applications were denied again after reconsideration. R. at 74-76; 77-79. Perry-Sharp requested a hearing, and on December 1, 2009, a hearing was held. R. at 35-54. On December 16, 2009, Administrative Law Judge, Priscilla M. Rae (the "ALJ"), concluded that based on Perry-

Sharp's application for a period of disability and DIB, Perry-Sharp was disabled beginning on January 1, 2006 and ending on November 2, 2008. R. at 22. Further, the ALJ concluded that based on Perry-Sharp's application for SSI, Perry-Sharp was disabled beginning on January 1, 2006 and ending on November 2, 2008. *Id.* On October 22, 2010, the Appeals Council affirmed the ALJ's decision. R. at 1-3. On November 19, 2010, Perry-Sharp filed the Complaint in this case. Dkt. No. 1.

### B. MEDICAL HISTORY

Perry-Sharp was forty-nine years old at the date of the ALJ's decision. R. at 18-21. She had completed the eleventh grade and received a GED. R. at 39. Perry-Sharp testified that she had uncontrolled diabetes and high blood pressure that decreased with medication but still fluctuated. R. at 40-41. She also testified that when she walked she experienced shortness of breath and leg pain. R. at 42. Perry-Sharp testified that she could walk about a half block before her legs began to hurt and she experienced shortness of breath. *Id.* Perry-Sharp testified that she could stand for ten to fifteen minutes before needing to sit down; sit for ten to fifteen minutes before needing to stand; and lift ten pounds. R. at 46-49. Perry-Sharp also testified that she vacuums, but does not mop, does not do the dishes, does not carry laundry up and down the stairs, and only occassionally goes to the grocery. R. at 44-45. She testified that she became short of breath if she picked up her grandchildren or played with them, and that she used both a nebulizer and an inhaler to assist her with her shortness of breath. R. at 43. Finally, she testified that she has been diagnosed with renal failure and, as a result, must watch her fluid intake and experiences back pain and frequent urination. R. at 45. She testified that she has to urinate approximately every fifteen minutes. *Id.*

On November 7, 2005, Perry-Sharp went to the emergency room with the complaint of left sided chest pain. Her initial blood pressure was 209/119, but it improved with oral Clonidine to 179/100. R. at 367-68. The emergency room physician diagnosed her with "fully controlled hypertension" and "atypical chest pain." R. at 368.

On November 4, 2006, Perry-Sharp was admitted to the hospital with complaints of chest pain. R. at 302. Her blood pressure was poorly controlled with an initial presentation of 230/130. Id. A CAT scan of her chest showed no aortic dissection or pulmonary embolism, but it did show cardiomegaly, a somewhat enlarged heart, and some left midlung atelectasis, or mid-lung partial collapse, with possible air trapping. R. at 509. On November 4, 2006, An echocardiogram ("EKG") showed moderate enlargement of the left ventricle with mild hypokinesis, or reduced motion, and an ejection fraction of fifty percent. R. at 514-16. On November 6, 2006, Perry Sharp underwent a one day rest/stress protocol. R. at 577. The movement of her heart was mildly slowed, and the estimated left ventricular ejection fraction was forty-one percent. *Id.* On November 7, 2007, Perry-Sharp was discharged with a diagnosis of hypertension, chest pain, acute coronary syndrome, and diabetes. R. at 303-05. Her doctor prescribed medications and she was scheduled for an outpatient angiogram. *Id.*

On November 15, 2006, Perry-Sharp underwent an outpatient angiogram. R. at 472. It revealed an eighty percent lesion in the ostium of the left anterior descending artery. *Id.* Perry-Sharp had a stent placed in her left anterior descending coronary artery. R. at 464. After the stent placement, Perry-Sharp was asymptomatic and able to walk in the hallway without any chest discomfort. R. at 472.

On December 15, 2006, Perry-Sharp's cardiologist, Dr. Chokkalingam, reported that Perry-Sharp was progressing well. R. at 619-20. On December 22, 2006, Perry-Sharp went to the Indiana Heart Hospital to be evaluated and begin cardiac rehabilitation. R. at 436. She reported that since the placement of her stent, she had some chest soreness, occasional quick sharp pains, and arm discomfort. *Id.* However, at the time of evaluation, she was not experiencing shortness of breath at rest. R. at 438. Her cardiac rehabilitation focus problem list included: (1) coronary artery disease; (2) diabetes mellitus, treated and reportedly fairly well controlled; (3) hypertension, treated an not controlled; (4) dyslipidemia, treated; (5) remote history of tobacco use; (6) sedentary lifestyle; (7) obesity. *Id.* At the time of her rehabilitation appointment, Perry-Sharp's reported height was 5'4" and her reported weight was 207.7 pounds. R. at 437. She stated that she did not exercise, but she reported that since the stent placement, she had been following a strict diet that controlled her carbohydrates, fats, cholesterol, and sodium. *Id.* Her stated goal for the cardiac rehabilitation program was to achieve some effective weight loss. R. at 439.

On January 11, 2007, Perry Sharp underwent a treadmill stress test. R. at 576. The test showed that her exercise capacity was fair and her heart rate response to exercise was appropriate. *Id.* She had resting hypertension and an exaggerated response to the exercise. She did not experience chest pain and had no arrhythmias. *Id.* Ultimately, the physician interpreting the test stated that it was non-diagnostic due to an abnormal base line. *Id.* Three weeks later, Dr. Chokkalingam observed that Perry-Sharp had angina symptoms and mild left ventricle dysfunction, most likely from hypertension and coronary artery disease. R. at 617-18. He increased her medication. R. at 618.

On May 22, 2007, Perry-Sharp saw another cardiologist, Dr. Aasar.  Dr. Aasar suggested that Perry-Sharp undergo a treadmill stress test.  R. at 638.  On May 31, 2007, Perry-Sharp's stress test was negative for ischemia.  R. at 642.  The myocardial perfusion imaging was abnormal, suggesting cardiomyopathy with LV dysfunction.  *Id.*  Perry-Sharp's ejection fraction was thirty-five percent.  *Id.*  Dr. Aasar recommended that Perry-Sharp undergo cardiac catheterization, and adjusted Perry-Sharp's medication.  R. at 639.

One week later, state agency reviewing physician Michael Brill stated that Perry-Sharp could perform light work; never climb ladders, ropes, or scaffolds; occasionally perform all other postural activities; and should avoid concentrated exposure to temperature extremes. R. at 654-57.  Four months later, another state agency physician reviewed the evidence in Perry-Sharp's file and affirmed Dr. Brill's opinion as written. R. at 697.

On July 17, 2007, cardiac catheterization showed that Perry-Sharp's ejection fraction was forty percent.  R. at 663.  The catheterization also showed ten percent stenosis at the site of the prior stent.  *Id.*  Dr. Aasar prescribed beta blocker medication and recommended aggressive medical therapy, an exercise program, and a low-fat and low-sodium diet.  R. at 664.

On July 24, 2007, Dr. Aasar wrote a letter to the Social Security office that detailed Perry-Sharp's cardiac history.  R. at 671.  It stated that she had a history of combination of ischemic heart disease and hypertensive heart disease.  *Id.*  Dr. Aasar stated that he would limit Perry-Sharp's standing to between thirty and sixty minutes over a period of four hours at a time.  *Id.*  Dr. Aasar recommended a regular exercise program, regular walking

5

with a mild-to-moderate level of physical activity.  *Id.*  Further, Dr. Aasar stated that he would restrict Perry-Sharp from lifting any weight over 30 pounds for the next year.  *Id.*

On November 26, 2007, Dr. Aasar saw Perry-Sharp for a cardiac evaluation.  R. at 714.  Perry-Sharp had run out of medication a few days prior to the appointment and presented with a blood pressure of 180/110.  *Id.*  However, Perry-Sharp had lost ten pounds and was otherwise compliant with all recommendations.  *Id.*  Perry-Sharp reported feeling much better.  *Id.*  Dr. Aasar reported that Perry-Sharp was doing very well from a cardiac perspective and, further, that Perry-Sharp understood that running out of medication could lead to major stroke or major heart attack.  *Id.*  Dr. Aasar encouraged Perry-Sharp to call Dr. Aasar's office if she ran out of medications and Dr. Aasar could work out an arrangement with samples to ensure that Perry-Sharp had access to her medications.  *Id.*

On January 16, 2008, Perry-Sharp saw Dr. Aasar complaining of chest pain and shortness of breath.  R. at 716.  Perry-Sharp's symptoms were mildly suggestive of underlying coronary artery disease and possible in-stent restenosis.  *Id.*  Perry-Sharp's blood pressure was 172/118.  *Id.*  Perry-Sharp's EKG did not show any new changes, and Dr. Aasar believed that her symptoms were related to hypertensive urgency and running out of her medication rather than coronary artery disease.  *Id.*

On May 28, 2008, Perry-Sharp's blood pressure measured at 125/80 after an initial reading of 158/100. R. at 720.  Dr. Aasar noted that Perry-Sharp's blood pressure was well controlled with her current medical regimen.  *Id.*  Dr. Aasar noted that he would like to repeat Perry-Sharp's exercise stress test.  *Id.*

On October 29, 2008, Perry-Sharp reported both a chronic level of shortness of breath and that her blood pressure was out of control as a result of her running out of her medication. R. at 724. However, she felt ready to proceed with her stress test. *Id.* Her blood pressure was 150/100. *Id.* Dr. Aasar added new drugs to Perry-Sharp's medical regimen. *Id.*

On November 13, 2008, Perry-Sharp saw Dr. Aasar's nurse practitioner, Beverly Altman, for a progress check. R. at 728-29. Perry-Sharp reported being medication compliant. R. at 728. Perry-Sharp further stated that she had been attempting to walk on a regular basis, but that she was caring for her infant granddaughter and unable to exercise regularly. *Id.* Perry-Sharp stated that she was working out at a fitness center on weekends. *Id.* Nurse Altman advised Perry-Sharp to undertake a gradually progressive aerobic and light weight bearing exercise program with a goal of thirty to forty minutes of aerobic activity four to five times weekly. *Id.*

On November 20, 2008, Perry-Sharp underwent a treadmill stress test. R. at 732. Her blood pressure was 170/100 at baseline and its peak was 240/88, which was an appropriate response. *Id.* The test was terminated due when Perry-Sharp achieved her target heart rate. *Id.* The test showed she had an ejection fraction of sixty-three percent and no reversible ischemia. R. at 732-33.

On March 26, 2009, Nurse Altman saw Perry-Sharp for an episodic evaluation. R. at 734. Her blood pressure was 134/86. *Id.* Perry-Sharp reported that she felt her blood pressure was relatively well-controlled but was a little elevated that day because of a chronic toothache and headache. *Id.* Perry-Sharp reported that she was not exercising with any regularity. *Id.* Nurse Altman reviewed safe exercise guidelines with Perry-Sharp

and encouraged her to begin and maintain a gradually progressive aerobic and light weight bearing exercise program with a goal of thirty to forty minutes of regular activity three to five times weekly.  R. at 734-35.

On June 26, 2009, Perry-Sharp underwent an exercise stress test.  R. at 740.  Her resting blood pressure was 148/100 and went to 200/102, which was a normal response.  *Id.*  The test was terminated after almost seven minutes for asymptomatic generalized fatigue.  Her left ventricle was normal in size both at rest and after stress.  R. at 741.  Further, she maintained a normal patter of perfusion in all regions of her heart post-stress.  *Id.*  Dr. Vincent M. Bournique, the nuclear interpreting physician concluded that this was a normal myocardial perfusion scan and further that Perry-Sharp's ejection fraction was sixty percent. Id.  Dr. Bournique also stated that Perry-Sharp's exercise capacity is normal and her global left ventricular systolic function is normal.  *Id.*

### C.  THE ALJ's DECISION

The ALJ found that from January 1, 2006 through November 1, 2008, Perry Sharp had the residual functional capacity ("RFC") to perform sedentary work, except that Perry-Sharp could not sit for more than four hours a day and, therefore, was disabled.  R. at 17-18.  Conversely, the ALJ found that Perry-Sharp experienced medical improvement as of November 2, 2008, and on that date, Perry-Sharp's disability ended.  R. at 19.  Specifically, the ALJ found that beginning on November 2, 2008, Perry-Sharp had the residual functional capacity to perform the full range of sedentary work.  *Id.*  The ALJ further found that Perry-Sharp's statements concerning the intensity, persistence, and limiting effects of her symptoms after November 2, 2008, not credible.  R. at 20.  Specifically, the ALJ found

Perry-Sharp's allegation that due to her heart problems, obesity, diabetes, and renal failure she suffered constant fatigue and limited her ability to stand, and walk not credible. *Id.*

## II. STANDARD

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. §405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner.  *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Id.*  While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning."  *Diaz*, 55 F.3d at 307.  An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence."  *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

## III. DISCUSSION

Perry-Sharp asserts that the ALJ's credibility determination with respect to Perry-Sharp's statements concerning the intensity, persistence and limiting effects of her symptoms after November 2, 2008 is erroneous because it is contrary to SSR 96-7p. The ALJ's credibility determination is as follows:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible beginning on November 2, 2008, to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

R. at 20. The ALJ goes on to recite Perry-Sharp's treatment history in narrative form as her reasoning for not crediting Perry-Sharp's statements concerning the intensity, persistence and limiting effects of her symptoms. *Id.* In so doing, the ALJ fails to build a logical bridge between the evidence and her conclusion. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (noting that although the ALJ is not required to discuss every piece of evidence, he or she must build a logical bridge from evidence to conclusion). Although the ALJ discusses evidence that suggests that Perry-Sharp underwent medical improvement, she fails to explain whether that evidence was consistent or inconsistent with her conclusion or even why the evidence supported her conclusion that Perry-Sharp's statements concerning the persistence, intensity and limiting effects of her symptoms. Additionally, the Court notes that the Seventh Circuit has stringently disapproved of the boilerplate language the ALJ utilizes in her credibility determination. *See Bjornson v. Astrue*, No. 11-2422, 2012 U.S. App. LEXIS 1790, at *11-*14 (7th Cir. Jan. 12, 2012) (Posner, J.) ("A deeper problem [with the language] is that the assessment of a claimant's ability to work will often . . .

depend heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms, but the passage implies that ability to work is determined first and is used to determine the claimant's credibility.").

Furthermore, SSR 96-7p requires ALJs to articulate the reasons behind credibility evaluations:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone . . . [the adjudicator must consider the following factors] in addition to the objective medical evidence when assessing the credibility of an individual's statements: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain and other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment that the individual uses or has used to relieve pain or other symptoms . . . ; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 SSR LEXIS 4, *8 (July 2, 1996); see also 20 C.F.R. § 404.1529 (requiring consideration of the same factors). In her opinion, the ALJ did not address these factors explicitly, but that, in itself, is not a bar to a coming to a legally sufficient credibility determination. *See Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2010) (recognizing that even a 'sketchy opinion' is sufficient if it assures the reviewing court that the ALJ considered the important evidence and enables the reviewing court to trace the ALJ's reasoning). However, in the instant case, the ALJ did not appear to consider any of Perry-Sharp's testimony regarding her daily activities. For instance, Perry-Sharp testified that she experienced shortness of breath by picking up her grandkids or playing with them, that she does not often go to the grocery, that she does not do the dishes, she does not carry the

laundry up and down the stairs, and that she limits her trips up and down the stairs in her home to once a day, R. at 44-45, but the ALJ made no mention of these activities in her opinion.  R. at 14-22.  As to the medication Perry-Sharp uses to control her symptoms,  the ALJ failed to consider Perry-Sharp's testimony that she is on a nebulizer four times a day and uses an inhaler three to four times a day to help control her shortness of breath.  R. at 43.  n fact, with the exception of noting that with respect to Perry-Sharp's  conditions, "he [sic] states that his [sic] conditions cause him [sic] constant fatigue and limit his [sic] ability to stand, and walk . . . [cause] swelling in his [sic] feet and legs," and noting that "when [Perry-Sharp] walks about a half block or climbs a flight of stairs, the claimant states he [sic] feels shortness of breath," the ALJ makes no specific reference to Perry-Sharp's testimony at all in her opinion.

Finally, SSR 96-7p provides that ALJ's credibility determination must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason's for that weight."  1996 SSR LEXIS 4, *8 (July 2, 1996).  The ALJ's opinion does not make clear what weight if any she gave to Perry-Sharp's statements.  R. at 19-21.  Although the ALJ does consider both the objective medical evidence in the record and subjective statements Perry-Sharp made over the course of her treatment, the ALJ's lack of consideration for Perry-Sharp's testimony, and her failure to both build a logical bridge between the evidence she does cite and her credibility determination and to explain the specific weight she accords Perry-Sharp's statements concerning her symptoms requires the Court to **REMAND** this case to the agency for further consideration.  *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (noting that although the ALJ is not required to discuss every piece of evidence, he or she

must build a logical bridge from evidence to conclusion); *see also Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009).

## IV.  **CONCLUSION**

For the reasons stated herein, this cause is REMANDED for further proceedings consistent with this opinion.

IT IS SO ORDERED this 15th day of March, 2012.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com